2022 IL App (1st) 201255-U

FIRST DISTRICT,
FIRST DIVISION
December 30, 2022

No. 1-20-1255

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 92 CR 13556 04 |
| | ) | |
| TIMOTHY MOBLEY, | ) | Honorable |
| | ) | Neera Lall Walsh, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Lavin concurred in the judgment.
Justice Hyman dissented.

**ORDER**

¶ 1    *Held*: Circuit court did not err in denying defendant leave to file a successive postconviction petition where he failed to establish cause and prejudice in his petition.

¶ 2    After a jury trial, defendant Timothy Mobley was found guilty of murder and aggravated kidnapping. The circuit court sentenced defendant to consecutive terms of 90 years' imprisonment for murder and 5 years' imprisonment for aggravated kidnapping. Defendant's convictions and sentences were affirmed on direct appeal. *People v. Mobley*, No. 1-94-4206 (March 27, 1997) (unpublished order under Illinois Supreme Court Rule 23). This Court affirmed the trial court's denial of defendant's initial *pro se* postconviction petition under the Post-Conviction Hearing Act

(Act) (725 ILCS 5/122-1 *et seq.* (West 1998)). *People v. Mobley*, No. 1-06-0349 (June 30, 2008) (unpublished order under Illinois Supreme Court Rule 23). The trial court's denial of leave to file defendant's first successive postconviction petition was also affirmed. *People v. Mobley*, 2020 IL App (1st) 171273-U.

¶ 3 On August 7, 2019, defendant sought leave to file a second successive postconviction petition, claiming that because he was 20 years old at the time of these offenses, his sentence violated the principles articulated in *Miller v. Alabama*, 567 U.S. 460 (2012), the eighth amendment, and the proportionate penalties clause of the Illinois Constitution. The circuit court denied leave to file, finding that defendant failed to meet the cause-and-prejudice test. For the following reasons, we affirm.

¶ 4             BACKGROUND

¶ 5 Defendant was convicted of the first degree murder and aggravated kidnapping of 19-year-old Kristin Ponquinette. Since the facts of this case have been fully set forth in our prior orders, we restate only those facts necessary to resolve defendant's current appeal. See, *e.g.*, *Mobley*, 2020 IL App (1st) 171273-U, ¶¶ 4-19.

¶ 6 On the evening of April 17, 1992, Carin Smith accompanied Sharon Burke to Cassandra Butler's house. Ponquinette attempted to leave when they arrived, but Burke told her that she "wasn't going anywhere." Burke and Butler forced Ponquinette into the basement; slapped her; questioned her about calling Burke a "bitch;" asked "who [she] had been sleeping with;" held a saw to her throat; cut her hair with a scissors; tied her hands behind her back with a tape measure; stuffed a sock in her mouth; and forced her into a closet.

¶ 7 After leaving Butler's house, Smith realized she did not have her keys. When Smith returned, Ponquinette was still tied up with the sock in her mouth and was being taunted by Butler,

Venus Becom, Chezeray Moore, and Terrence Mobley.[1] Butler's brother came downstairs and told everyone to leave. Ponquinette was untied and left the house with Terrence and Moore.

¶ 8        Becom testified that she went with Sonya Richardson and Lashonda Wilson to Moore's garage, where they found Moore, Amotto Jackson, and Ponquinette. Richardson told Ponquinette she would make her "suck all the brothers' dicks." She told Becom to go get "the brothers" (the male members of the Black Stones street gang), including defendant, Henry Lovett, Moore and Terrance. When Becom returned, Ponquinette "was crying to Moore's mother to help her." Moore's mother told the group to leave the garage and "get [Ponquinette] out of my house."

¶ 9        Several male Black Stones gang members, including defendant, Moore, Charles Carpenter, and Jackson, were at a nearby park playground when Becom arrived with Ponquinette. Becom accused Ponquinette of having sex with her boyfriend and knocked her down. Becom and Richardson kicked and beat Ponquinette while she was on the ground. After approximately five minutes, defendant eventually "broke it up," and the women stopped beating Ponquinette.

¶ 10        Jackson led Ponquinette away from the group towards the "black bridge," a bridge over the Cal-Sag Channel near South Eggleston and West 129th Place. Becom heard defendant tell the others that Ponquinette "knows too much already about the one service, we have to get rid of her, kill her or something, get her away from around here."[2] Carpenter also heard defendant say, "kill the bitch."

¶ 11        Becom explained the "ranking system" for the Black Stones street gang: Defendant was an "Angiel" in the gang, meaning that he could "tell the other brothers what to do." Defendant had the authority to instruct lower-ranking members, such as Moore and Jackson, to commit murder. Lower-ranking gang members needed to obtain permission from a higher-ranking member to

---

[1] We refer to Terrence Mobley by his first name to avoid confusion with defendant.
[2] Becom testified that a "service" was a gang meeting conducted at the black bridge.

participate in a murder.

¶ 12     Lloyd Bryant picked defendant up from the park and drove him to a nearby liquor store to pick up Henry Lovett. Defendant told Bryant that he was doing "nation business," which Bryant understood to mean that he was doing "Black Stone business." Defendant and Lovett got out of Bryant's car near the black bridge.

¶ 13     Approximately 30 minutes after Jackson and Ponquinette left the playground, Wilson and another Black Stone gang member were walking toward the black bridge when Jackson approached them "laughing saying that he was going to get a sewer cover." They continued walking and ran into Moore, who said, "We hit the bitch in the head with bricks and she still wouldn't die." Wilson saw Ponquinette "laying on some railing" near the bridge with her hands and feet tied together. Lovett warned Wilson that they should leave if they did not want to see what was going to happen. As Wilson was leaving, she saw Jackson carrying a sewer cover over his head.

¶ 14     On April 26, 1992, Ponquinette's body was recovered from the Cal-Sag Channel, downriver from the black bridge. Her hands were tied behind her back with white rope and her feet were bound with green electrical wire. A sewer cover tied with green electrical wire matching the wire on Ponquinette's feet was also recovered in the Channel near the black bridge, along with a large rock smeared with human blood and Ponquinette's hair. According to the report, Ponquinette was alive when she entered the water and died from "drowning in association with blunt trauma injuries to the head." The jury returned a verdict finding defendant guilty of first degree murder and aggravated kidnapping.

¶ 15     The presentence investigation report (PSI) introduced at defendant's sentencing hearing reflected that defendant was 20 years old at the time of the murder and had a 1990 felony conviction for unlawful use of a weapon and a 1991 felony conviction for possession of a

controlled substance, for which he was on probation at the time of the instant offense. The PSI also indicated that defendant was raised by his parents, with whom he had "a close relationship." Although he never received a high school diploma, "he took English and business courses at Kennedy-King College and Olive-Harvey College." Defendant had co-owned a bar with his father for six years and admitted that he sold cocaine from age 18 to 21. He reported no mental health issues or problems with alcohol or marijuana, which he began using when he was 16. Defendant had been a Black Stones street gang member since the age of 16.

¶ 16    The State requested a "substantial sentence" of natural life in prison, arguing that defendant "started the ball rolling ***. People acted on what he said. He is just as guilty, just as responsible for her death as the people who actually threw her off the bridge."

¶ 17    In mitigation, defense counsel argued that defendant did not physically participate in the offenses and was not present "when [Ponquinette] was actually thrown off the bridge." While conceding that defendant issued the order to kill Ponquinette, counsel argued that defendant "has a minimal acquaintanceship with the criminal justice system," "is a young man," "has taken some courses in college," "is bright," "has a capability," and could be rehabilitated. Counsel urged the court to "give Mobley credit for his testifying" as a State witness in an unrelated murder trial and requested a sentence of "30 or 40" years.

¶ 18    Before imposing sentence, the trial court "considered the facts of this case, *** the arguments and statements made by the parties, *** the aggravating and mitigating factors, both the statutory and those as presented to me in the presentence investigation and by argument of the parties." The court found the facts to be "exceptionally brutal and heinous, indicative of wanton cruelty" and "shockingly evil." The court recognized that "the defendant set into motion the events that occurred that day," and that "if the defendant did not utter those words, he might not even be here today. There might not be any case." The court also considered the defendant's cooperation

"with the authorities and testifying in that particular case *** in mitigation." Defendant was sentenced to 90 years' imprisonment for first degree murder, to be served consecutively to 5 years' imprisonment for aggravated kidnapping.

¶ 19    On direct appeal, defendant argued, *inter alia*, that the trial court abused its discretion "when it ignored his rehabilitative potential and sentenced him to 95 years in prison" because of his role in the murder. *People v. Mobley*, No. 1-94-4206 (March 27, 1997) (unpublished order under Illinois Supreme Court Rule 23) This court affirmed the circuit court, finding that the sentence was not excessive, and the trial court considered defendant's rehabilitative potential.

¶ 20    On September 9, 1998, defendant filed an initial *pro se* petition for postconviction relief claiming, *inter alia*, that his trial counsel was ineffective for failing to communicate with him or investigate and call witnesses. *People v. Mobley*, No. 1-98-4360 (December 26, 2000) (unpublished order under Illinois Supreme Court Rule 23). The trial court summarily dismissed the petition, finding that it was untimely and patently without merit. We excused the untimeliness of defendant's petition, finding that "he acted without culpable negligence," and reversed and remanded for an evidentiary hearing. *Mobley*, No. 1-98-4360.

¶ 21    On remand, after an evidentiary hearing, the trial court found that defendant had not shown that he received ineffective assistance of counsel. This court affirmed. *People v. Mobley*, No. 1-06-0349 (June 30, 2008) (unpublished order under Illinois Supreme Court Rule 23).

¶ 22    On September 19, 2014, defendant mailed a motion for leave to file his first successive postconviction petition. His subsequent motion to dismiss the appeal was granted on July 20, 2016. Defendant refiled his motion for leave to file a successive postconviction petition on September 8, 2016. He alleged that the State suborned perjury and committed a *Brady* violation, and that his trial counsel had a *per se* conflict of interest. The trial court denied leave to file in a written order

entered on April 7, 2017, finding that defendant had not established cause and prejudice. This court affirmed. *Mobley*, 2020 IL App (1st) 171273-U.

¶ 23 On August 7, 2019, defendant sought leave to file his second successive postconviction petition, claiming that he was 20 years old at the time of these offenses and the trial court failed to consider a number of mitigating sentencing factors, in violation of *Miller v. Alabama*, 567 U.S. 460 (2012), the eighth amendment, and the proportionate penalties clause of the Illinois Constitution. He also alleged that his due process and equal protection rights were violated by expert testimony introduced at trial. On January 14, 2020, defendant supplemented his petition with his own affidavit describing the circumstances of his upbringing. The trial court denied leave to file on September 11, 2020, finding that defendant failed to meet the cause-and-prejudice test.

¶ 24 ANALYSIS

¶ 25 On appeal, defendant focuses solely on the sentencing claims raised in his August 7, 2019, petition, alleging violations of his constitutional rights under the eighth amendment of the United States Constitution (U.S. Const., amend VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) as applied to him. Defendant asserts that his petition demonstrates *prima facie* cause and prejudice under the Act.

¶ 26 The Act provides that a defendant may assert a "substantial denial" of his constitutional rights under the United States Constitution or the Illinois constitution or both, 725 ILCS 5/122-1 (West 2018); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009), but contemplates the filing of only one petition without leave of court. *People v. Lusby*, 2020 IL 124046, ¶ 27. Because successive petitions "plague the finality of criminal litigation," these hurdles are only "lowered in very limited circumstances, where fundamental fairness so requires." (Internal quotation marks omitted.) *People v. Tenner*, 206 Ill. 2d 381, 392 (2002).

¶ 27    The filing of a successive postconviction petition is only allowed if defendant satisfies the "cause-and-prejudice" test. *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002); 725 ILCS 122-1(f). "Cause" is established by "identifying an objective factor that impeded" the "ability to raise a specific claim during *** initial post-conviction proceedings" and "prejudice" is shown by demonstrating that the claim not raised "so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f). The trial court "must determine whether defendant has made a *prima facie* showing of cause and prejudice" before granting leave for the petition to be filed. *People v. Bailey*, 2017 IL 121450, ¶ 24.

¶ 28    Leave of court to file a successive postconviction petition should be denied "when it is clear, from a review of the successive petition and the documentation *** that the claims alleged by the [defendant] fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *People v. Smith*, 2014 IL 115946, ¶ 35. Whether the denial of defendant's motion for leave to file a successive postconviction petition was proper is an issue that is reviewed *de novo*. *Bailey*, 2017 IL 121450, ¶ 13.

¶ 29    The State concedes that defendant has established a *prima facie* showing of cause, "given the nascence of claims relating to *Miller*, which was decided in 2012, and the lack of any authority extending *Miller* to young adult offenders when petitioner filed his initial post-conviction [petition] in 1998." We disagree. "It is well established that we, as a court of review, are not bound by a party's concession." *People v. Carter*, 2015 IL 117709, ¶ 22.

¶ 30    The unavailability of *Miller* and its progeny does not constitute cause for defendant to raise a claim under the proportionate penalties clause of the Illinois Constitution. Defendant relies on evolving case law and scientific research to establish cause. In *People v. Dorsey*, 2021 IL 123010, our supreme court observed that "Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing." *Id.* ¶ 74. The court

held that "*Miller*'s unavailability prior to 2012 at best deprived defendant of some 'helpful support' for his state constitutional law claim, which is insufficient to establish 'cause.' " *Id*. (quoting *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 59). Based on *Dorsey*, defendant's failure to raise his proportionate penalties claim in his initial petition does not establish "cause."

¶ 31     Defendant is also unable to establish prejudice, as his claims are not legally cognizable under either *Miller*'s eighth amendment principles or the proportionate penalties clause of the Illinois Constitution. In *Miller*, 567 U.S. at 479, the United States Supreme Court held that a juvenile offender cannot be sentenced to mandatory life in prison without the possibility of parole. The Court explained that a mandatory sentence precludes the sentencing court from considering mitigating circumstances specific to youth and its attendant characteristics. *Id*. at 477-78. Our supreme court later explained that *Miller*'s language is " 'significantly broader than its core holding.' " *People v. Buffer*, 2019 IL 122327, ¶ 25 (quoting *People v. Holman*, 2017 IL 120655, ¶ 38).

¶ 32     To prevail on a *Miller* claim, "a defendant sentenced for an offense committed *while a juvenile* must show that (1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." (Emphasis added) *Id*. ¶ 27. A *de facto* life sentence for a juvenile is any sentence greater than 40 years. *Id.* ¶ 41.

¶ 33     *Miller*'s eighth amendment protections have not been extended to "offenders 18 years of age or older." *People v. Harris*, 2018 IL 121932, ¶ 61 (rejecting the defendant's *Miller* claim because "for sentencing purposes, the age of 18 marks the present line between juveniles and adults. As an 18-year-old, defendant falls on the adult side of that line."); *People v. Herring*, 2018 IL App (1st) 152, ¶ 103 ("[T]he [Supreme] Court drew a line at the age of 18 years; while it acknowledged that the line was arbitrary, it 'must be drawn.' ") (quoting *Roper v. Simmons*, 543

U.S. 551, 574 (2005)). Because defendant was 20 years old at the time of these crimes, his eighth amendment claim fails as a matter of law.

¶ 34        Defendant also argues that his sentence violates the proportionate penalties clause of the Illinois constitution, which requires that "all penalties should be determined according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; see *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 69 (the proportionate penalties clause is not determined in lockstep with the eighth amendment but may provide additional limitations on penalties). Under this provision, the application of a sentencing statute is unconstitutional when it "is shocking to the moral sense of the community" based on an "evolving standard[] of decency that mark[s] the progress of a maturing society." *People v. Miller*, 202 Ill. 2d 328, 339-40 (2002).

¶ 35        Imposing a sentence of 95 years for an "exceptionally brutal and heinous" murder during which the victim was kidnapped, beaten, restrained, and drowned does not shock the moral sense of the community. The trial court imposed a sentence within the statutory sentencing range of 60 to 100 years, finding that the murder was accompanied by "exceptionally brutal and heinous behavior indicative of wanton cruelty." 730 ILCS 5/5-8-2 (West 1994); 730 ILCS 5/5-5-3.2(b)(2) (West 1994). This case is distinguishable from those in which a trial judge has no discretion due to mandatory sentencing requirements.

¶ 36        The sentence imposed by the court reflects defendant's personal culpability in ordering Ponquinette's murder. In the words of the trial judge: "The defendant set into motion the events that occurred that day. If the defendant did not utter those words, he might not even be here today. There might not be any case." Defendant, a Black Stones "Angiel," ordered subordinate gang members to "kill" Ponquinette because she knew "too much" about gang activities. Based on defendant's order, lower-level gang members beat Ponquinette with a rock, bound her hands and

feet with rope and electrical wire, tied her to a sewer cover, and threw her from the bridge into the channel while she was still alive, causing her to drown "in association with blunt trauma injuries to the head." The record supports the trial court's finding that "[t]his case is shockingly evil." We cannot say that the discretionary sentence imposed for ordering Ponquinette's execution was "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *Miller*, 202 Ill. 2d at 339-40.

¶ 37 The record does not support defendant's claim that the trial court did not consider whether "his functioning was constitutionally akin to that of a juvenile." The circuit court considered the information contained in the PSI and defense counsel's arguments in mitigation regarding defendant's functioning. The information presented to the court included but was not limited to the following: defendant was 20 years old at the time of the murder; while he never graduated high school, he had taken college courses; he had co-owned a bar with his father for six years; and he denied he any mental health issues or having a problem with alcohol or marijuana.

¶ 38 In addition, defendant's claim that the trial court was "unable to take into account information about [his] potential for rehabilitation" was rejected by this court on direct appeal. In *People v. Mobley*, No. 94-4206 (March 27, 1997) (unpublished order under Illinois Supreme Court Rule 23, we found that "we cannot say that *** the trial court failed to consider defendant's rehabilitative potential." See *Dorsey*, 2021 IL 123010, ¶ 31 ("[T]he doctrine of *res judicata* bars issues that were raised and decided on direct appeal").

¶ 39 Because defendant's petition failed to satisfy the cause-and-prejudice test, his motion for leave to file a successive postconviction petition was properly denied. See *Smith*, 2014 IL 115946, ¶ 35.

¶ 40 CONCLUSION

¶ 41 For the reasons set forth herein, we affirm the judgment of the circuit court of Cook County.

¶ 42    Affirmed.

¶ 43    JUSTICE HYMAN, dissenting:

¶ 44    Recent developments relating to juvenile sentencing allow Timothy Mobley to seek a review of his life sentence, despite the magnitude of his crime, and Mobley's crime was violent and heinous. Critical is the record, and the record here does not support the majority's conclusion. As the United States Supreme Court acknowledged in *Graham v. Florida*, 560 U.S. 48, 61 (2010), "a threshold comparison between severity of the penalty and the gravity of the crime does not advance the analysis."

¶ 45    The majority joins decisions holding that *People v. Dorsey*, 2021 IL 123010, precludes Mobley from filing a successive postconviction petition raising an as-applied challenge to his *de facto* life sentence under the proportionate penalties clause. *E.g.*, *People v. French*, 2022 IL App (1st) 220122 (collecting cases).

¶ 46    A fair reading of Supreme Court caselaw leads to the opposite result: Mobley made a *prima facie* showing of cause. Indeed, petitions litigating similar claims are pending before the Illinois Supreme Court. *People v. Moore*, 2020 IL App (4th) 190528, appeal allowed, No. 126461 (Nov. 24, 2021); *People v. Williams*, 2020 IL App (2d) 180526-U, appeal allowed, 126932 (Nov. 24, 2021). Likewise, a fair reading of the record and the successive petition compels finding Mobley made a *prima facie* showing of prejudice.

¶ 47                            Analysis

¶ 48                        *Standard of Review*

¶ 49    This court reviews *de novo* a trial court's decision to deny leave to file (*People v. Bailey*, 2017 IL 121450, ¶ 13). In doing so, we accept as true all well-pled facts and affidavits. *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 25.

¶ 50                    *Successive Postconviction Petition*

¶ 51    The Post-Conviction Hearing Act allows the filing of multiple petitions. Petitioners may by right file an initial petition (725 ILCS 5/122-1) and with leave of court may file a successive petition (725 ILCS 5/122-1(f)). Petitioners who seek to file a successive petition must submit enough documentation to allow the court to determine if the alleged facts make "a *prima facie* showing of cause and prejudice." *Bailey*, 2017 IL 121450, ¶ 24. Courts deny petitioners leave to file "when it is clear" their "claims fail as a matter of law or where the successive petition with supporting documentation is insufficient[.]" *People v. Smith*, 2014 IL 115946, ¶ 35.

¶ 52            ***Prima Facie Cause for Failure to Raise Constitutional Claim***

¶ 53    A petitioner "shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial postconviction proceedings[.]" 725 ILCS 5/122-1(f).

¶ 54    In appeals from the leave-to-file stage, appellate panels routinely have allowed a *prima facie* showing of cause based on the evolving caselaw on sentencing juveniles and young adults. *See*, e.g., *People v. Minniefield*, 2020 IL App (1st) 170541, ¶ 31; *French*, 2022 IL App (1st) 220122, ¶ 26 (collecting recent cases). But some panels, citing the Supreme Court's decision *Dorsey*, have reached the opposite conclusion, holding sentencing claims by young adults fail as a matter of law. *See*, e.g., *French*, 2022 IL App (1st) 220122, ¶ 34 (citing *Dorsey*, 2021 IL 123010); *but see*, *People v. Vega*, 2022 IL App (1st) 200663-U, ¶ 47.

¶ 55    Neither *Dorsey* nor decisions in its wake offer a "clear" explanation (*Smith*, 2014 IL 115496, ¶ 35) why sentencing claims like Mobley's fail as a matter of law. To the contrary, *Dorsey* and the majority add to a deepening split by failing to address conflicting Supreme Court caselaw.

¶ 56    First, consider the timing of orders entered in *Dorsey*, *Moore*, and *Williams*. The Supreme Court decided *Dorsey* on July 29, 2021, and it denied a petition for rehearing on November 22,

2021. *Dorsey*, 2021 IL 123010. Two days later, the Court allowed leave to appeal in *Moore* and *Williams*. (Since then, the Court consolidated *Moore* and *Williams*.)

¶ 57    While drawing inferences from a sequence of unexplained, discretionary decisions by the Supreme Court intrinsically involves venturing into the realm of the unknown and unknowable, the Supreme Court's conflicting caselaw provides a possible explanation. *Dorsey* did not write on a blank slate. *Dorsey* does not fit with the Court's caselaw on cause, on the relationship between the eighth amendment and the proportionate penalties clause, or the novelty of young adult sentencing claims.

¶ 58    Quoting *Dorsey*, the majority writes, "*Miller*'s unavailability prior to 2012 at best deprived [petitioner] of some 'helpful support' for his state constitutional claim[.]" *Infra* ¶ 30 (quoting *Dorsey*, 2021 IL 123010, ¶ 74, quoting *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 59). Accordingly, Mobley's claim fails under *Dorsey* because "some 'helpful support' " does not alone establish cause. *Infra* ¶ 30. The majority accurately quotes *Dorsey* but bypasses the conflicting caselaw.

¶ 59    Before *Dorsey*, there was *Pitsonbarger*, in which the Court adopted the "cause and prejudice" test as "the analytical tool" for analyzing whether a court should permit the filing of a successive petition. *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002). When discussing "cause," the Court approved of caselaw from the United States Supreme Court finding "cause" where " ' a constitutional claim is so novel that its legal basis is not reasonably available to counsel[.]' " *Pitsonbarger*, 205 Ill. 2d at 461 (discussing *Reed v. Ross*, 468 U.S. 1, 16 (1984)).

¶ 60    Consistent with *Pitsonbarger* and *Bailey*, 2017 IL 121450, the *prima facie* cause for Mobley's claim arose after his initial postconviction proceedings. The Supreme Court has recognized that young adult petitioners can raise as-applied challenges in postconviction petitions. *Harris*, 2018 IL 121932, ¶ 48 (Post-Conviction Hearing Act "specifically allows for raising

"'constitutional questions which, by their nature, depend[] upon facts not found in the record.'" (internal quotations omitted)); *People v. House*, 2021 IL 125124, ¶ 32 (remanded for second-stage postconviction proceedings); see *People v. Thompson*, 2015 IL 118151, ¶44 (petitioner may renew as-applied challenge in circuit court).

¶ 61 Furthermore, in 1998, during his initial postconviction proceedings, Mobley could not have anticipated the line of cases expanding the holding of *Miller*. (For similar reasons, nor could he have anticipated the Supreme Court's decision in *People v. Leon Miller*, 202 Ill. 2d 328 (2002).)

¶ 62 That said, the Supreme Court in *Dorsey* did state, "*Miller*'s announcement of a new substantive rule under the eighth amendment does not provide cause for a defendant to raise a claim under the proportionate penalties clause." *Dorsey*, 2021 IL 123010, ¶ 74. But see *French*, 2022 IL App (1st) 220122, ¶ 32 (analyzing whether *Dorsey*'s analysis was "*obiter dicta*" or "judicial *dicta*"). But again, this statement is at odds with other pronouncements of the Court.

¶ 63 Before *Dorsey*, there were *McDonald*, *Clemons*, and *Patterson*. In *McDonald*, our Supreme Court described the proportionate penalties clause as "synonymous" with the eighth amendment's cruel and unusual punishment clause. *People v. McDonald*, 168 Ill. 2d 420, 455 (1995). In *Clemons*, the Supreme Court abrogated that holding. *People v. Clemons*, 2012 IL 107821, ¶ 40. But two years later, the Supreme Court in *Patterson* said, "[T]he Illinois proportionate penalties clause is co-extensive with the eighth amendment's cruel and unusual punishment clause[.]" *Patterson*, 2014 IL 115102, ¶ 106. So *Dorsey* runs headlong into these conflicting cases. See *People v. Coty*, 2020 IL 123972, ¶ 45 (noting "appellate decisions * * * have aptly pointed out that this court has not spoken consistently on the relationship between our proportionate penalties clause and the eighth amendment").

¶ 64 *Dorsey* cites *Patterson* to find a juvenile petitioner cannot rely on *Miller*'s "new substantive rule" as "cause" to raise a claim under the proportionate penalties clause. *Dorsey*, 2021 IL 123010,

¶ 74 (citing *Patterson*, 2014 IL 115102, ¶ 97). Yet, *Patterson* described the proportionate penalties clause and the cruel and unusual punishment clause as "co-extensive." *Patterson*, 2014 IL 115102, ¶ 106. *Dorsey*, in a single paragraph of analysis, never acknowledges this apparent contradiction nor explains why identical or "co-extensive" clauses would treat one case (*Miller*) in two different ways (*Dorsey* and *Davis*, 2014 IL 115595, ¶ 42).

¶ 65    By drawing out these contradictions, I do not mean to endorse a narrow view of our proportionate penalties clause. But, as I have observed, "by now, it is axiomatic that the proportionate penalties clause provides greater protections than the eighth amendment." *People v. Hill*, 2022 IL App (1st) 171739-B, ¶ 41.

¶ 66    Take, for example, *French*, which noted that for more than 100 years, young adult sentencing claims were "buildable" under the proportionate penalties clause. *French*, 2022 IL App (1st) 220122, ¶ 31 (citing *People v. Haines*, 2021 IL App (4th) 190612, ¶ 56, *pet. for leave to appeal pending*, no. 128006 (filed Dec. 21, 2021)). Nevertheless, the panel held a young adult petitioner could not establish cause "because the Illinois proportionate penalties clause existed long before he filed his initial postconviction petition." *Id.* ¶ 34.

¶ 67    Respectfully, I find this holding difficult to square with common sense. Some constitutional claims—like *Miller* claims and cases expanding on it—are so novel that their legal bases are not reasonably available until a court makes them so. See *Pitsonbarger*, 205 Ill. 2d at 461. I view these claims not just through a historical prism but also as a response to our evolving social values and norms that befit a maturing society. See *Miller v. Alabama*, 567 U.S. 460, 469 (2012); *People v. Buffer*, 2019 IL 122327, ¶ 40.

¶ 68    Mobley made a *prima facie* showing to challenge his *de facto* life sentence. I reach this conclusion because a fair reading of our caselaw does not make "clear" (*Smith*, 2014 IL 115946,

¶ 35) his as-applied challenge under the proportionate penalties clause should fail as a matter of law.

¶ 69                                    *Prima Facie Showing of Prejudice*

¶ 70            In addition, Mobley has made a *prima facie* showing of prejudice. Generally, a petitioner "shows prejudice by demonstrating that the claim not raised during his [or her] * * * initial postconviction proceedings so infected the trial that the resulting * * * sentence violated due process." 725 ILCS 5/122-1(f). Mobley met that burden by alleging: (i) his 20-year-old brain was like a juvenile brain; (ii) he received a *de facto* life sentence; and (iii) the sentencing court did not properly consider his youth and its attendant circumstances. *See*, *e.g.*, *People v. Horshaw*, 2021 IL App (1st) 182047, ¶ ¶ 132-150; *People v. Brewer*, 2021 IL App (1st) 172314-U, ¶ ¶ 27-56.

¶ 71            The majority rejects these three contentions, misreading Supreme Court caselaw and the record underlying Mobley's sentence.

¶ 72            First, the majority writes Mobley's as-applied claim under the proportionate penalties clause is "not legally cognizable." *Supra* ¶¶ 25, 31. This assertion finds no support in Supreme Court caselaw. Indeed, the Court in *Harris* directed a young adult to raise an as-applied challenge to his *de facto* life sentence under the proportionate penalties clause, not the eighth amendment. *Harris*, 2018 IL 121932, ¶ 45. See also *House*, 2021 IL 125124, ¶ 32. Because Mobley did so in his petition and on appeal focused on this claim, I reject the majority's assertion.

¶ 73            Second, the majority writes Mobley's *de facto* sentence is "distinguishable from those in which a trial judge has no discretion due to mandatory sentencing requirements." *Supra* ¶ 35. Under Illinois law, this is not a meaningful distinction. In *Holman*, the Supreme Court rejected the discretionary/mandatory dichotomy. *People v. Holman*, 2017 IL 120655, ¶ 44. *See* generally *Horshaw*, 2021 IL App (1st) 182047, ¶ ¶ 125-131 (discussing history of mandatory/discretionary distinction).

¶ 74        Third, the majority contends that Mobley's sentencing was *Miller*-compliant, and Mobley raised this claim on direct appeal. *Supra* ¶ ¶ 34-37, 38. But, our Supreme Court has cautioned courts and litigants that few pre-*Miller* records will be "developed sufficiently for appellate review of an as-applied *Miller* claim." *Harris*, 2018 IL App 121932, ¶ 43. In the Court's view, records meeting that criteria will fall under a " 'very narrow exception.' " *Id.* ¶ 44 (quoting *Holman*, 2017 IL 120655, ¶ 32).

¶ 75        The record here justifies the Supreme Court's caution. The majority contends Mobley's original sentencing complied with *Miller* because the "circuit court considered the information in the PSI and defense counsel's arguments in mitigation." *Supra* ¶ 37. The record demonstrates that the PSI cannot bear the weight the majority places on it. The PSI contains no psychological information and states that Mobley denied having any mental health history. And, significantly, the PSI itself cautions that, given too little time to prepare before sentencing, the information "may or may not have been verified." The record does not show that defense counsel filled evidentiary gaps. Although the majority notes defense counsel argued on Mobley's behalf, the record fails to indicate that defense counsel presented any evidence in mitigation.

¶ 76        Against this backdrop, Mobley's successive petition adds quite a bit. *Edwards*, 2012 IL App (1st) 091651, ¶ 25 (noting courts must take as true allegations that record does not positively rebut). Mobley's affidavit establishes that he suffered physical, emotional, and sexual abuse by his peers, parents, and school principal. The affidavit also shows he suffered a significant head injury sometime after turning 13-years-old, around the time he gave into peer pressure and began regularly abusing drugs and alcohol and participating in gang activity. Lastly, the affidavit indicates that the officer who prepared his PSI included only "bare bones" assertions and spoke with Mobley for just a few minutes.

¶ 77     Thus, Mobley's petition sufficiently alleged the existence of facts personal to him that warrant further litigation of his as-applied claim under the proportionate penalties clause. Not only does the record belie the majority's claim that Mobley's sentencing hearing complied with *Miller*, but it also belies that this court could have considered the issue on direct appeal.

¶ 78     I would reverse and remand for second stage proceedings.